**SCALISE INDUSTRIES and The PMA Group, Petitioners,**

v.

**WORKERS' COMPENSATION APPEAL BOARD (CENTRA), Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 18, 2002.

Decided May 1, 2002.

Michael P. Routch, Hollidaysburg, for petititoners.

Gilbert E. Caroff and Suzann M. Lehmier, Johnstown, for respondent.

BEFORE: LEADBETTER, Judge, and SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Senior Judge McCLOSKEY.

Scalise Industries and the PMA Group (hereafter collectively referred to as Employer) petition for review of an order of the Workers' Compensation Appeal Board (Board), affirming an order of the Workers' Compensation Judge (WCJ), granting the claim petition filed on behalf of Salvatore Centra (Claimant).[1] We affirm.

Employer is engaged in the construction business. Employer employed Claimant

---

1. The WCJ also granted Claimant's petition for review of utilization review determination regarding certain chiropractic treatment he received. However, said petition is not at issue in the present appeal.

as a sheet metal worker. In the course and scope of his employment on July 19, 1995, Claimant sustained numerous injuries when a ten-inch diameter pipe weighing between five and six hundred pounds fell on him. The pipe struck Claimant's right shoulder and neck, driving the right side of his chest into his knees. The impact also knocked Claimant completely unconscious. After regaining consciousness, Claimant experienced a burning sensation in his chest and neck. He was thereafter transported to a local hospital, which discharged Claimant later that evening. Claimant missed work the following day, as he was unable to get out of bed. He returned to work the day after, but could hardly move and had trouble breathing at night.

Approximately three weeks later, Claimant returned to work at a job site in Homer City. Claimant worked in a limited capacity for four to five months, but never really felt right physically. He experienced pain in his back, neck and right shoulder, as well as shortness of breath.[2] Claimant also had problems sleeping at night and would routinely wake up and twist his neck and back until it clicked, allowing him to fall back asleep.[3] Claimant thereafter sought treatment from his family physician, Dr. John Solic, and a chiropractor, Dr. Susan Harchak.

Specifically, Claimant first saw Dr. Solic for these problems on August 21, 1995.

During his examination of Claimant on this date, Dr. Solic found Claimant's blood pressure to be elevated, a tender trapezius muscle and a limited range of motion in Claimant's neck. Additionally, Dr. Solic detected a loud heart murmur, something he did not notice on any previous examinations.[4] Dr. Solic believed Claimant's heart murmur was related to a torn mitral valve. Dr. Solic thereafter referred Claimant to Dr. Anthony Cardell, a specialist in cardiovascular diseases. In the meantime, on July 1, 1996, Claimant retired from his employment with Employer, allegedly because of his ongoing physical problems.[5]

Dr. Cardell first examined Claimant on July 30, 1996, and found that Claimant's heart murmur was consistent with severe mitral regurgitation.[6] Dr. Cardell, noting that such a condition deteriorates over time, believed that Claimant would ultimately require a mitral valve replacement. Following testing in November of 1996, Dr. Cardell recommended that Claimant's mitral valve be surgically repaired, as opposed to replaced. Dr. Cardell then referred Claimant to Dr. Ralph Damiano, a cardiac surgeon at Hershey Medical Center. Dr. Damiano first saw Claimant on December 12, 1996, at which time he observed significant symptoms of congestive heart failure and severe mitral regurgitation. Claimant subsequently underwent mitral valve replacement surgery by Dr.

2. Claimant experienced none of these types of problems prior to the work incident of July 19, 1995. Claimant did have a preexisting cervical disc herniation, but experienced no symptoms related to that condition.

3. Occasionally, Claimant would stick his head in the freezer which helped him breathe.

4. Dr. Solic had been Claimant's family physician since 1990 and had examined Claimant's heart on at least twelve different occasions

since that time, the last of which being less than a year earlier, in September of 1994.

5. As will be seen below, the facts surrounding Claimant's retirement are in great dispute.

6. The mitral valve allows blood to flow from the lungs, into the left atrium, into the left ventricle and out into the body. Mitral regurgitation occurs when the mitral valve allows a back flow of blood from the ventricular cavity to the atrial cavity.

Damiano on February 25, 1997.[7]

Prior to this surgery, either Claimant or his counsel contacted Employer regarding Claimant's mitral valve injury.[8] By notice of workers' compensation denial dated February 17, 1997, Employer declined to pay Claimant benefits, alleging that although Claimant sustained an injury on July 19, 1995, he suffered no disability as a result of said injury. Employer further specifically denied that any mitral valve injury was related to the July 19, 1995, work accident. Thereafter, on March 17, 1997, Claimant filed a claim petition against Employer alleging that he sustained injuries in the nature of "[c]ervicothoracic sprain/strain; C5/C6 disc herniation; chest pain—diagnosed as acquired/traumatic mitral valve impairment." Employer filed an answer denying the material allegations of Claimant's petition.

The case was assigned to a WCJ and proceeded with hearings. At these hearings, Claimant testified on his own behalf, relating a history of his work injury, his subsequent physical problems, including his mitral valve surgery, and his continuing complaints of pain in his neck, back and right shoulder.[9] Claimant also testified regarding the circumstances surrounding his retirement. Claimant admitted that none of his treating physicians at

the time ever advised him concerning the same. Nevertheless, Claimant indicated that he could not continue his sheet metal work for Employer because he "wasn't feeling right." (R.R. at 17a). In fact, Claimant left the job site in Homer City before it was finished. Claimant indicated his desire to continue working until he attained the age of sixty-five, but noted that he just "couldn't do it" anymore.[10] (R.R. at 18a). Further, Claimant testified that he "would go back" to work "if he could." (R.R. at 19a).

In support of his petition, Claimant also presented the testimony of Dr. Solic, his family physician. Dr. Solic reiterated the facts above regarding his August 21, 1995, examination of Claimant. Dr. Solic opined that Claimant's heart murmur was related to the accident at work on July 19, 1995.[11] More specifically, Dr. Solic opined that during said accident, Claimant sustained a tear in his mitral valve and the tear became progressively worse to the point that he required replacement surgery.[12] Further, Dr. Solic opined that Claimant's condition had deteriorated to the point where he was physically incapable of working as a sheet metal worker as of about six months prior to his heart surgery.

In addition, Claimant presented the testimony of Dr. Cardell, to whom he was

7. The valve could not be repaired.

8. It is unclear from the evidence of record whether Claimant or his counsel contacted Employer at this time.

9. Prior to the second hearing in this case, in February of 1998, Claimant suffered from bleeding on the brain, which led to a hemorrhagic stroke. Claimant's doctors believed this problem was a complication related to his use of the blood thinner medication coumadin, which was prescribed following Claimant's mitral valve surgery in order to prevent blood clotting due to an artificial valve.

10. Claimant testified that he kept "forcing himself" to continue working and that his

strength "wouldn't last like it did" before. (R.R. at 18a–19a).

11. Dr. Solic also opined that Claimant's neck problems were caused by the July 19, 1995, work accident.

12. Dr. Solic noted that a similar condition could be caused by degeneration of the valve. However, he noted that such a condition normally results in a distinctive patter of murmurs over a period of time. Dr. Solic indicated that this type of clinical progression did not occur over the course of his treatments with Claimant.

referred by Dr. Solic. Dr. Cardell reiterated the findings of his 1996 examinations of Claimant, including mitral regurgitation. Dr. Cardell indicated that blunt trauma, such as was present in Claimant's case with the falling of a large object (the pipe) and the subsequent impact to the body, is a well-known cause for a variety of heart injuries, one of which being mitral regurgitation. Dr. Cardell proceeded to render his opinion that Claimant's mitral valve problems and condition were the direct result of the traumatic work injury Claimant sustained on July 19, 1995.[13] Dr. Cardell further testified that Claimant was unable to resume anything near the highly physical lifestyle that he enjoyed prior to July 19, 1995.

Additionally, Claimant presented the testimony of Dr. Damiano, his cardiac surgeon. Dr. Damiano reiterated the findings of his December 12, 1996, examination of Claimant, as well as his subsequent mitral valve replacement surgery. Dr. Damiano indicated that a pathology report ruled out degeneration as the cause of Claimant's mitral valve failure. Dr. Damiano also discussed Claimant's bleeding on the brain and hemorrhagic stroke, opining that the same were directly related to his use of coumadin following surgery.[14]

Further, Claimant presented the testimony of Dr. Harchak, his chiropractor. Dr. Harchak first saw Claimant in November of 1995 and has treated him since. Dr. Harchak originally diagnosed Claimant as suffering from cervico-thoracic strain/sprain. Dr. Harchak opined that Claimant's condition was "absolutely" caused by the accident at work on July 19, 1995. (R.R. at 284a). Dr. Harchak indicated that said work injury was a separate injury in and of itself which aggravated Claimant's preexisting cervical disc herniation, thereby constituting a disabling injury of a permanent nature.

In opposition to Claimant's claim petition, Employer presented the testimony of Dr. Larry Hurwitz, a cardiologist. Dr. Hurwitz conducted two independent medical evaluations of Claimant[15] and also reviewed Claimant's extensive medical records. Dr. Hurwitz opined that Claimant's progressive mitral regurgitation was related to natural degeneration of the mitral valve and not to a traumatic event. Dr. Hurwitz did agree that an episode where the anterior right chest is driven into the knees could potentially cause myocardial trauma, which may not show up immediately. Dr. Hurwitz further agreed that Claimant's use of coumadin might have increased the likelihood of hemorrhagic stroke.

Employer also presented the testimony of Dr. Michael G. Moncman, a neurological surgeon, in opposition to Claimant's petition. Dr. Moncman performed an independent medical evaluation of Claimant on November 12, 1997, limited to the musculoskeletal or spinal conditions from which Claimant suffered. Dr. Moncman opined that Claimant was fully recovered from any musculoskeletal injuries he sustained on July 19, 1995. However, Dr. Moncman admitted to uncertainty as to the position Claimant was in when he struck by the

---

13. Dr. Cardell noted that his opinion seemed to be corroborated by testing which showed a very specific defect in the substructure around the mitral valve, rather than degeneration of the valve. Dr. Cardell indicated that such findings are classic and characteristic of traumatic mitral valve injuries resulting in abrupt onset of mitral regurgitation.

14. Dr. Damiano noted that only one to three percent of patients annually have a complication related to coumadin.

15. The first examination was February 3, 1997, and the second was September 29, 1997.

pipe, including the weight of the pipe or the height from which it fell.

Ultimately, the WCJ issued a decision and order granting Claimant's claim petition. In rendering his decision, the WCJ accepted the testimony of Claimant's medical experts, Drs. Solic, Cardell, Damiano and Harchak, as competent and credible, while specifically rejecting the testimony of Employer's medical experts, Drs. Hurwitz and Moncman.[16] Based upon this credible testimony, the WCJ found that Claimant suffered from a traumatic injury to his mitral valve, as well as cervicothoracic strain and subsequent cerebrovascular hemorrhage, all of which were causally related to the July 19, 1995, work incident. Additionally, the WCJ found that said injuries caused Claimant to be disabled on and after August 25, 1996. Employer appealed to the Board and the Board affirmed.

On appeal to this Court,[17] Employer argues that the Board erred in affirming the decision of the WCJ. More specifically, Employer argues that the Board and the WCJ erred as a matter of law in finding that Claimant was forced into retirement on July 1, 1996, as Claimant failed to present any unequivocal medical evidence that he was incapable of working as of that date. We disagree.

We have recently addressed the effect of voluntary retirement on a claimant's compensation benefits. In *U.S. Airways v. Workers' Compensation Appeal Board (Dixon)*, 764 A.2d 635, 644 (Pa.Cmwlth. 2000), *petition for allowance of appeal denied*, 567 Pa. 753, 788 A.2d 382 (2001), we stated as follows:

Under the Act,[18] a claimant is entitled to disability benefits only where the claimant's loss of earning power is caused by his or her disabling work-related injury or disease. *Republic Steel Corp. v. Workmen's Compensation Appeal Board (Petrisek)*, 537 Pa. 32, 640 A.2d 1266 (1994). Consequently, when the claimant voluntarily retires or leaves the labor market, his or her disability benefits must be suspended. *Southeastern Pennsylvania Transportation Authority v. Workmen's Compensation Appeal Board (Henderson)*, 543 Pa. 74, 669 A.2d 911 (1995); *Smith v. Workers' Compensation Appeal Board (Dunhill Temporary Systems)*, 725 A.2d 1285 (Pa.Cmwlth.1999). In order to continue to receive disability benefits following retirement or separation from employment, therefore, the claimant must establish that he or she is seeking employment or that he or she was forced into a compulsory retirement or separation from employment due to the work-related injury. *Henderson; City of Philadelphia v. Workmen's Compensation Appeal Board (Defruscio)*, 695 A.2d 910 (Pa.Cmwlth.1997).

Additionally, in *Maroski v. Workers' Compensation Appeal Board (Bethlehem Steel Corporation)*, 725 A.2d 1260, 1264 (Pa.Cmwlth.1999), *petition for allowance of appeal denied*, 560 Pa. 690, 742 A.2d 678

---

**16.** Although the WCJ made no specific finding of credibility regarding Claimant's testimony, such finding is implicit in the WCJ's decision.

**17.** Our scope of review in a workers' compensation appeal is limited to determining whether an error of law was committed, constitutional rights were violated, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. *Russell v. Workmen's Compensation Appeal Board (Volkswagen of America)*, 121 Pa. Cmwlth. 436, 550 A.2d 1364 (1988).

**18.** Act refers to the Pennsylvania Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4; 2501–2626.

(1999), we explained that such cases present "mixed questions of fact and law and that a final decision should be based on the particular facts as found by the WCJ in each case." "Therefore, we must examine the WCJ's findings and the evidence upon which those findings rely to determine whether [c]laimant has proven that ... he was forced to retire because of his work related injury." *Id.*

■ In its brief to this Court, Employer asserts that, because Claimant was seeking benefits pursuant to a claim petition, he must satisfy the burden of establishing that he was forced to retire through the presentation of unequivocal medical evidence. We agree that unequivocal medical evidence must be presented on behalf of a claimant that a work-related injury or disease precludes continuation of employment, i.e., a work-related injury or disease results in disability under the Act. *See Republic Steel Corporation v. Workmen's Compensation Appeal Board (Petrisek)*, 537 Pa. 32, 640 A.2d 1266 (1994). However, we have found no authority to support a special requirement that a physician testify that he recommended retirement to a claimant or that the disability caused the claimant to retire. The claimant may establish through his own testimony his motivation to retire. *See Shannopin Mining Co. v. Workmen's Compensation Appeal Board (Turner)*, 714 A.2d 1153 (Pa.Cmwlth.1998).[19]

■ In this case, despite the fact that Claimant testified that none of his doctors ever suggested he retire, Claimant did testify as to the requirements of his job and

the problems he was having prior to making his decision to retire. Specifically, Claimant testified that his job was physically demanding and required him to climb and work in high areas, as well as extremely hot areas. (R.R. at 3a–4a). Immediately prior to his retirement, Claimant indicated that he was supervising a job in Homer City, but was still required to climb scaffolding to check the work that was being done. *See* R.R. at 11a.

Claimant also indicated that during the four or five months at this job, he just "wasn't right," that he never "physically" felt good. *Id.* Specifically, Claimant indicated that he had trouble breathing, i.e., shortness of breath, trouble driving as he would fall asleep behind the wheel and trouble sleeping as he would routinely have to wake up and twist his neck and back "to get it to click." (R.R. at 12a). Ultimately, Claimant testified that he left the job in Homer City prior to its completion "because [he] wasn't feeling right" and just "couldn't do it" any longer. (R.R. at 17a–18a).[20]

Further, the WCJ specifically questioned Claimant as to his reasons for retiring. When asked what exactly caused him to retire, Claimant responded that he "liked to work and [he] couldn't do the things that [he] could do before." (R.R. at 107a). Claimant explained that "things" referred to climbing scaffolding and working in hot areas, as he would "run out of air" and "couldn't breathe" in these types of environments. *Id.* Additionally, Claimant indicated that problems with his neck and his inability to stay awake behind the wheel were factors leading to his retire-

---

**19.** The facts in *Turner* are somewhat similar to the facts in the present case. In *Turner*, the claimant suffered from coal workers' pneumoconiosis, but it was not diagnosed at the time of his retirement. The claimant presented medical evidence as to his disease and resultant disability and further testified that

his breathing problems forced him to retire. An award of benefits was affirmed.

**20.** Claimant did testify that "if [he] could go back to work now [he] would go back." (R.R. at 19a).

ment.[21]  *See* R.R. at 108a.  The testimony of Claimant, coupled with the testimony of Drs. Solic, Cardell and Harchak, constitutes substantial evidence in support of the WCJ's decision.  Thus, we cannot say that the Board erred in affirming the same.

Accordingly, the order of the Board is affirmed.

### ORDER

AND NOW, this 1st day of May, 2002, the order of the Workers' Compensation Appeal Board is affirmed.

---

**21.**  The medical testimony presented by Claimant further supports his position.  For instance, both Drs. Solic and Cardell indicated that Claimant's mitral valve problems were progressive in nature and rendered Claimant disabled.  *See* R.R. at 146a–147a, 168a, 212a, 228a.  In addition, Dr. Harchak indicated that Claimant's cervical injury alone was disabling and of a permanent nature.  *See* R.R. at 275a, 278a, 286a.